UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CYPRESS CREEK
INTERMEDIARIES, INC.,

                              Plaintiff,

          – against –

WESTPORT INSURANCE CORP.,

                              Defendant.

**OPINION & ORDER**

22-cv-3649 (ER)

RAMOS, D.J.:

Cypress Creek Intermediaries, Inc. ("CCI"), a broker, brings this action against Westport Insurance Corporation ("Westport") for breach of contract, unjust enrichment, *quantum meruit*, breach of covenant of good faith and fair dealing, fraud, and a violation of a Massachusetts law for unfair and deceptive practices, Massachusetts General Laws Chapter 93A.  Doc. 1 ¶¶ 6–10, 62–96.  CCI alleges that Westport failed to pay the fee that CCI earned in connection with brokering Westport's acquisition of TMS, Re, Inc. ("TMS"), another insurance business.  *Id.* ¶ 6.

Before the Court is Westport's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), along with CCI's request for oral argument on the motion.  Doc. 20; Doc. 25.  For the reasons set forth below, Westport's motion is GRANTED in part and DENIED in part, and CCI's request for oral argument is DENIED as moot.

I.     **BACKGROUND**

     **A. Factual Background**

The following facts are based on the allegations in the complaint, which the Court accepts as true for purposes of the instant motion.  *See Koch v. Christie's Int'l PLC*, 699 F. 3d 141, 145 (2d Cir. 2012).  "Documents that are attached to the complaint . . . are deemed part of the pleading" and are also considered by the Court in this case.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citation omitted).

In April 2020, CCI became aware that TMS had an interest in being acquired by another insurance company.  Doc. 1 ¶¶ 7–10.  CCI thereafter assisted with the facilitation of a possible deal with an interested purchaser.[1]  *Id.* ¶ 11.  As part of that process, CCI drafted an agreement, titled "Confidentiality/Non-Disclosure and Representative Agreement," which was signed by TMS and the would-be "First Purchaser."  *Id.* ¶ 13; *see also* Doc. 1-1 at 2–5.  The agreement noted that CCI was "recognized by the [First Purchaser] as representative regarding all negotiations with [TMS] and involving the Transaction[.]"  Doc. 1-1 ¶ 10.  It further stated that CCI would be "an authorized agent of [the First Purchaser] for the purposes of section 5 of this Agreement."[2]  Doc. 1-1 ¶ 10.  CCI thus alleges that TMS knew that CCI was working for a fee, and both parties understood that the fee would be paid by the First Purchaser.[3]  Doc. 1 ¶ 14.

The prospective deal between TMS and the First Purchaser fell through after several months.  *Id.* ¶ 15.  CCI, however, maintained its efforts to find TMS a purchaser.  CCI proposed "TMS to Westport as a potential target of a purchase/acquisition" in late June 2020.  *Id.* ¶ 16.  According to CCI, its president, Andrew Pyle, had a good working relationship with Katie McGrath, an executive at Westport who was Managing Director and Head of Accident and Health when CCI approached Westport about the possible acquisition of TMS.  *Id.* ¶ 17.  Pyle and McGrath had previously completed other deals together when McGrath was employed at another company.  *Id.* ¶ 18.  Prior to CCI's outreach to McGrath, Westport had no relationship with TMS and was not aware that it was looking to be acquired.  *Id.* ¶ 19.

---

[1] The complaint refers to the interested purchaser, which is not a party to this litigation, as the "First Purchaser."  Doc. 1 ¶ 11.

[2] CCI did not provide "section 5" of the agreement between TMS and the First Purchaser.  *See generally* Doc. 1-1 at 1–5.

[3] CCI does not allege, however, that Westport ever saw the signed agreement between TMS and the First Purchaser, or otherwise knew that it existed.  *See* Doc. 1 ¶¶ 11–20.

On June 29, 2020, Pyle sent McGrath an email stating the following:

Dear Katie,

Good morning,  Trust all is well.

The Staff of Cypress Creek Intermediaries looks forward to working with you on a greater basis in 2020.  As you look to grow Swiss RE's A&H Division,[4] wanted to inquire whether your organization would have an interest via acquisition in acquiring a turnkey Employer Stop Loss/Provider Excess MGU organization.  [ . . . ]

The principals have in interest in selling to a carrier organization.  [ . . . ]

Merely looking to gauge your interest at this time.

[ . . . ]

Doc. 1-2 at 2; *see also* Doc. 1 ¶ 20.  The same morning, McGrath stated that "[w]e would have an interest.  Let me know next steps."  Doc. 1-2 at 2; Doc. 1 ¶ 21.

Thereafter, the parties engaged in a series of calls and email discussions.  On August 28, 2020, Pyle wrote to McGrath stating that, "[f]urther to our discussion last week, it appears you've been given the 'green light' by Swiss Re upper management to pursue opportunities which will grow the Swiss Re A&H portfolio."  Doc. 1-3 at 2.  Pyle then stated that he thought Westport "might have an interest" in "the following opportunity," and thereafter provided details about TMS.  *Id.*  The email noted that TMS was "not actively pursuing anything formal," however, TMS "would listen to an offer to strategically partner with and/or acquire" TMS.  *Id.*  Pyle asked whether McGrath had time to participate in a call regarding a possible deal with TMS the following week.  *Id.*; *see also* Doc. 1 ¶¶ 22–24.  McGrath proposed a date and time for the introductory call the following day.  Doc. 1-3 at 2; Doc. 1 ¶ 25.

The parties held a three-way telephone conference with TMS on September 1, 2020.  Doc. 1 ¶ 26; *see also* Doc. 1-3 at 2.  They discussed the need for a nondisclosure

---

[4] Westport is wholly owned by SR Corporate Solutions America Holding Corporation, which is wholly owned by Swiss Re Corporate Solutions Holding Company Ltd.  Doc. 14.  Swiss Re Corporate Solutions Holding Company Ltd. is wholly owned by Swiss Reinsurance Company Ltd., which in turn is wholly owned by Swiss Re Ltd., a publicly traded company in a Swiss exchange.  *Id.*

agreement ("NDA") "to protect the confidentiality of the deal and to recognize Cypress Creek as the 'representative regarding the negotiations.'"  Doc. 1 ¶ 26.  CCI alleges that the parties agreed that CCI would draft the agreement, which would include a provision naming CCI "as the facilitator of the transaction."  *Id.* ¶ 27.

CCI sent Westport the NDA, along with an email discussing the parties' phone call "regarding a possible partnership," on September 11, 2020.  *Id.* ¶ 28; *see also* Doc. 1-4 at 2; Doc. 1-5 at 2–5.  The NDA was titled "Confidentiality/Non-Disclosure and Representative Agreement."  Doc. 1-5 at 2.  Westport signed and returned the NDA to CCI the same day.[5]  Doc. 1 ¶ 29; Doc. 1-4 at 2; Doc. 1-5 at 5.

As relevant to the parties' dispute, the NDA provides that "Cypress Creek Intermediaries, Inc., is recognized by [Westport] as representative regarding all negotiations with [TMS] and involving this Proposed Acquisition and/or Strategic Partnership."[6]  Doc. 1-5 ¶ 10; Doc. 1 ¶ 31.  It also makes clear that it was to become effective on "the date of execution by the party signing last in time."  Doc. 1-5 ¶ 16; Doc. 1 ¶ 34.  The NDA further notes that its terms are governed by Massachusetts law.  Doc. 1-5 ¶ 13; *see also* Doc. 1 ¶ 32.

Several weeks after Westport signed the NDA, on September 29, 2020, McGrath had a telephone call with Pyle to discuss the acquisition of TMS.  Doc. 1 ¶ 35.  Later the same day, McGrath sent Pyle an email memorializing the parties' conversation, and indicating that Westport was interested in proceeding "quickly."  *Id.* ¶¶ 35–36; *see also* Doc. 1-6 at 2–3.  The email stated, however, that there was a "clarification that should be made in the TMS document," the NDA, prior to its finalization.  Doc. 1-6 at 3.  Specifically, McGrath noted Westport's understanding that CCI had been "engaged *by TMS* for strategic discussions that could potentially lead to a sale post July 2021."  *Id.*

---

[5] The NDA was not executed by TMS.  Doc. 1-5 at 5.

[6] As noted below, Westport later asked CCI to edit this language so that CCI was designated as TMS' representative.  Doc. 1-6 at 3.

(emphasis added); Doc. 1 ¶ 37.  McGrath therefore noted that various changes needed to

be made to the NDA, including a "change to item #10 showing [CCI] as representative

for [TMS]."  Doc. 1-6 at 3.

> Pyle responded the following day, on September 30, 2020, stating the following:
>
> Dear Katie,
>
> Spoke to our friend Mike Shevlin at TMS Re today.  We're enclosing a
> revised Non Disclosure Agreement accommodating his changes.
>
> 1. Section 1.  We can't make mention of any type of "acquisition" in the
> contractual verbiage.  So we've eliminated this.
>
> 2. Section 10.  Cypress Creek Intermediaries, Inc. is the party which
> brought this opportunity to you directly.  While we don't need to be
> recognized as an actual "representative" of either Swiss Re or TMS re, we
> do need to be recognized as the facilitating party.  We've already initiated
> a conference call between the parties, so the facilitation role has been
> established.
>
> While this might be a bit premature, we want to be clear with/in our
> expectations.  In the spirit of full disclosure (and as there is no reinsurance
> to be placed), CCI would anticipate compensation if any partnership took
> effect.  We'd anticipate a 1%-2% facilitation fee on all gross premium
> which would flow through the Swiss Re issuing carrier platform by TMS
> Re.  This would be paid by Swiss Re to CCI if any such partnership was
> solidified.
>
> Trust we can move forward with the NDA, and provide you with the
> background data so you can begin exploring this opportunity.  This
> program would be an ideal "building block" as you look to grow the Swiss
> Re portfolio.  We have your best interests at heart.
>
> Thanks Katie.  Let's move forward.

Doc. 1-6 at 2 (emphases omitted); Doc. 1 ¶ 38.  According to CCI, "[t]he reason that

TMS and Westport wanted to avoid any mention of any 'acquisition' was because TMS

would be required to pay another company, Munich Reinsurance Corp. ('Munich Re'), a

large fee in the event TMS was sold or acquired at that time, and TMS and Westport

conspired to conceal from Munich Re any information about the Westport acquisition."

Doc. 1 ¶ 47.

While the complaint states that "[n]o one on behalf of either Westport or TMS" objected, the documents that CCI attached to the complaint show the contrary.  Doc. 1 ¶¶ 39, 41, 46.  On October 1, 2020, the day after Pyle sent the email indicating its anticipated facilitation fee, the CEO of TMS, Michael Shevlin, sent an email to CCI and Westport representatives.  Doc. 1-7 at 2.  In it, Shevlin noted that TMS was not looking to be acquired, or have any discussions regarding acquisition; TMS had not engaged CCI in any capacity; and it urged CCI to immediately stop having discussions about TMS in the marketplace.  *Id.*  Shevlin further noted that "[i]f we decide to execute an NDA with Swiss Re Corporate Solutions for a potential ESL partnership, we will develop the proposed wording, and send directly to Swiss."  *Id.*  Critically, the email stated that such an NDA, "will not include recognition of CCI in any capacity.  You will need a separate agreement between CCI and Swiss Re that clearly articulates your role with Swiss Re, and any potential for compensation."  *Id.*  To further clarify TMS' position, Shevlin stated "[o]bviously, we will not sign the inappropriate NDA you have presented to us."  *Id.* Shevlin copied McGrath for "transparency purposes."  *Id.*

CCI acknowledged this objection.  *Compare* Doc. 1 ¶ 39 (stating that neither Westport nor TMS objected to the statements in Pyle's September 30, 2020, email) *with* Doc. 1-8 at 2–3 (responding to TMS' objection).  Indeed, on October 2, 2020, Pyle sent Shevlin and McGrath an email asserting that any partnership discussions needed to go through CCI; CCI brought Swiss Re to TMS' attention; Shevlin instructed CCI to initiate a call with McGrath in August 2020; and Shevlin's actions apparently "clearly indicate[d] intent to work through [CCI] to initiate these discussions."  Doc. 1-8 at 2.  Pyle also noted that it drafted the NDA that Westport signed.  *Id.* at 3.

Shortly thereafter, on October 2, 2020, McGrath sent an email to CCI and TMS stating that "Swiss Re has a very specific engagement process and obviously did not engage Cypress for services since there would be an agreement to that end.  Swiss Re will acknowledge specific relationships, as we thought was the case between TMS and

Cypress.  However, since TMS also did not engage Cypress to seek out partnerships, I am not certain where we go."  Doc. 1-8 at 2.

Despite these statements, which CCI provided as attachments to its complaint, CCI states that, at some point *after* September 30, 2020, "Cypress Creek worked with Westport and TMS in an effort to facilitate the acquisition of TMS by Westport" and "agreed to pay Cypress Creek a reasonable fee in the range of 1% to 2% in connection with the Westport Acquisition, depending on the ultimate structure of the deal."  Doc. 1 ¶¶ 42, 43; *but see* Doc. 1-7; Doc. 1-8.  CCI does not cite to any support for the foregoing propositions.

The complaint further states that after working with CCI, both Westport and TMS "abruptly disavowed any relationship with Cypress Creek and falsely stated that neither party had any interest in moving forward with the Westport Acquisition."  Doc. 1 ¶ 48.  However, Westport and TMS continued negotiations and completed the acquisition after TMS' obligation to Munich Re expired, after July 2021.  *Id.* ¶¶ 37, 49, 56, 58.  Accordingly, CCI alleges, "[u]pon completion of the Westport Acquisition, Cypress Creek earned a fee owed by Westport, but no fee was ever paid . . . ."  *Id.* ¶ 61.

### B.  Procedural History

CCI filed the complaint and supporting documents on May 5, 2022.  Doc. 1.  Thereafter on June 13, 2022, Westport filed a letter motion requesting a pre-motion conference regarding its anticipated motion to dismiss.  Doc. 13.  The Court held the conference on July 19, 2022, granted Westport leave to file its motion to dismiss, and provided the parties with a briefing schedule.

Westport filed the instant motion pursuant to the schedule, and briefing was completed on September 23, 2022.  Doc. 20; Doc. 24.  CCI filed a letter motion requesting oral argument on the motion on October 4, 2022.  Doc. 25.

## II.     LEGAL STANDARD

Under Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

When determining whether that standard has been met, the Court may consider the complaint itself, as well as all documents attached thereto or incorporated therein.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002); *Foros Advisors LLC*, 333 F. Supp. 3d 354, 357 (S.D.N.Y. 2018).  A document is incorporated when it is referenced in the complaint or when its terms and effects are relied upon heavily such that it may be considered "integral" to the pleadings.  *Chambers*, 282 F.3d at 152–53 (citation omitted); *see also Palin v. N.Y. Times Co.*, 940 F.3d 804 (2d Cir. 2019); *Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015) (quoting *Roth*, 489 F.3d at 509) ("It is well established that '[d]ocuments that are attached to the complaint or incorporated into it by reference are deemed part of the pleading and may be considered.'").

To survive a Rule 12(b)(6) motion, the plaintiff must allege sufficient facts to show more than a "mere possibility" that a defendant has acted unlawfully.  *Twombly*, 550 U.S. at 557.  This "flexible 'plausibility standard'" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.  The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citations omitted).

Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *see also Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable....").  However, to the extent that the exhibits attached to the complaint credibly contradict the allegations attached within the complaint itself, the Court may conclude that the allegations are not, in fact, plausible. *Beauvoir*, 794 F.3d at 248 (concluding that a "threadbare recital" in the complaint was contradicted by the attached exhibit, and Plaintiffs thus failed to plausibly allege their claim).

## III.   DISCUSSION

Westport moves to dismiss all counts in the complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  The motion is granted as to Counts I, IV, V, and VI of the complaint for the reasons set forth below.

### A.  Choice of Law Analysis

As a preliminary matter, the Court briefly addresses the parties' choice-of-law arguments.  *See* Doc. 1 ¶ 32; Doc. 21 at 16 n.3, 24; Doc. 22 at 11.  According to CCI, the NDA provision indicating that its terms would be governed and interpreted in accordance with Massachusetts law reaches and applies to all claims before the Court.  Doc. 22 at 11; Doc. 1-1 ¶ 13.  Westport disagrees.  It argues that "the relevant choices are Florida, where

Cypress Creek is located; Missouri, where Westport is incorporated; or New York, where Westport is licensed, where much of its management is based, and where Cypress Creek chose to bring suit."  Doc. 21 at 16 n.3.  In any event, Westport argues that New York law applies because the basic principles of contract law are the same in those three states. *Id.*

Critically, as CCI emphasizes, the parties agree that there is only one count as to which a conflict of law exists, Count V of the complaint, which alleges a violation of a Massachusetts law regarding unfair and deceptive acts in the conduct of commerce.[7] Doc. 22 at 11 (noting that "the law in the two jurisdictions," Massachusetts and New York, "is generally consistent, except for Massachusetts General Laws 93A, § 11"); *Liang v. Progressive Cas. Ins. Co.*, 172 A.D.3d 696, 697 (N.Y. App. Div. 2019); *see also* Doc. 1 ¶¶ 82–87; Mass. Gen. Laws ch. 93A § 11.

The Court underscores that because a "choice of law analysis is fact intensive, courts often decline to make a choice of law determination at the motion to dismiss stage."  *Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 398 (S.D.N.Y. 2018) (citation omitted).  When facts necessary to make that determination are sufficiently clear, however, courts in this District have engaged in this analysis at the motion to dismiss stage.  *See, e.g.*, *id.*; *Patel v. N.Y. Life Ins. Co.*, No. 11 Civ. 4895 (JPO), 2012 WL 1883529, at *3 (S.D.N.Y. May 21, 2012).

At this early stage, the Court declines to make a definitive choice of law determination as to CCI's claims.  *Holborn Corp.*, 304 F. Supp. 3d at 398.  Because the parties agree that there is no conflict as to Counts I, II, III, IV, and VI of the complaint, the Court analyzes those claims pursuant to New York law.  The Court applies Massachusetts law to Count V, as the parties do, in this preliminary determination

---

[7] In regard to this conflict, Westport contends that "[t]he only conceivable reason that Cypress Creek asserts a claim under the Massachusetts statute . . . is that [it] allows a court to award double or treble damages for 'willful or knowing' violations."  Doc. 21 at 23.

regarding whether CCI stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); *see also* Doc. 21 at 23–26; Doc. 22 at 25–28.

### B.  Breach of Contract Claim

Westport argues that Count I of the complaint, the breach of contract claim, should be dismissed because no fee agreement was ever formed, and New York's Statute of Frauds bars the claim.  Doc. 21 at 15–20.  CCI counters that a contract was indeed formed—the NDA—and it is not barred by the Statute of Frauds because it is both in writing and apparently sets forth the essential terms of the agreement.  Doc. 22 at 11–23.

Under New York's general principles of contract formation, a party seeking enforcement must show that there was an offer, acceptance, consideration, mutual assent, and the intent to be bound by the contract.  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (citing *Louros v. Cyr*, 175 F. Supp. 2d 497, 512 n.5 (S.D.N.Y. 2001)).  Additionally, New York's Statute of Frauds, in relevant part, provides that a "contract to pay compensation for services rendered in negotiating . . . the purchase, sale, exchange, renting or leasing . . . of a business opportunity, business, its good will, inventory, fixtures or an interest therein . . ." is "void" unless it is in writing.  N.Y. Gen. Oblig. Law § 5-701(a)(10).  By its terms, this provision also extends to "contract[s] implied in fact or in law to pay reasonable compensation," *id.*, ensuring that if a claimant's contract claims for finders' or brokers' fees are barred by § 5-701(a)(10), they cannot attempt to sidestep that result by proceeding under a quasi-contract theory.  *See, e.g.*, *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 613 (S.D.N.Y. 2010) (collecting cases).

Where no formal written contract exists, the Statute of Frauds may still be satisfied by an adequate written "note or memorandum" of the agreement.  § 5-701(a).  Courts interpreting that provision have imposed four threshold requirements on adequacy.  In short, the writing must, on its face:  (1) be subscribed to by the party charged; (2) designate the parties to the agreement; (3) identify and describe the subject matter; and (4) establish, either expressly or by reasonable implication, all the essential terms of the

agreement.  *E.g., Ginsberg Mach. Co. v. J & H Label Processing Corp.*, 341 F.2d 825, 827–828 (2d Cir. 1965); *see also Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 575 (1969); *Dahan v. Weiss*, 120 A.D.3d 540, 541 (N.Y. App. Div. 2d Dept. 2014) (collecting cases).

The Court agrees with Westport that no enforceable contract was formed here. *See Beauvoir*, 794 F.3d at 248 (concluding that a "threadbare recital" in the complaint was contradicted by the attached exhibit, and Plaintiffs thus failed to plausibly allege their claim).  Although the complaint alleges that "Westport agreed to pay Cypress Creek a reasonable fee in the range of 1% to 2% in connection with the Westport Acquisition," and further states Westport and TMS indeed consummated the acquisition, the exhibits that CCI attached to the complaint render those allegations implausible.  Doc. 1 ¶¶ 57, 58.

First, the document that CCI relies on, the proposed Westport-TMS NDA, was never made effective because TMS never signed it.  *See* Doc. 1-5 ¶ 16; Doc. 1-5 at 5. Indeed, TMS specifically and promptly disavowed it.  Doc. 1-7 at 2.  And even if TMS *had* signed the NDA, it was not an agreement between CCI and Westport regarding CCI's brokerage services and related fees; rather, it was to be a non-disclosure agreement between Westport and TMS, drafted so that Westport could learn more details about TMS in considering a possible acquisition or partnership.[8]  *See generally* Doc. 1-5; *see also* Doc. 1-4 at 2.  To be sure, the un-executed NDA did contain a provision stating that Westport would recognize CCI as "representative regarding all negotiations" with TMS

---

[8] The Court notes that the exhibits raise questions regarding the circumstances under which Westport signed the NDA.  Indeed, in an email dated October 2, 2020, McGrath stated that "Swiss Re will acknowledge specific relationships, as we thought was the case between TMS and Cypress."  Doc. 1-8 at 2.  In other words, the exhibits suggest that Westport may have signed the NDA pursuant to misunderstandings regarding the relationship between CCI and TMS.  *See* Doc. 1-7 at 2 (TMS stating to CCI that it would "not sign the inappropriate NDA" and that TMS had "been very clear with [CCI] about [its] business plans, timeframes and objectives.  While you state you have our best interest at heart, your actions seem to contradict that.  We would like to continue to have a relationship with you and CCI, we just need to make sure our activities are in alignment.").

and "involving" a proposed acquisition or strategic partnership.[9]  *Id.* ¶ 10.  However, that provision says nothing about CCI's "reasonable fee," or other essential terms of the alleged acquisition agreement, nor was it at any point rendered an effective provision between the parties because the NDA was never fully executed.  *Compare id. with* Doc. 1 ¶¶ 43, 48; *see also* Doc. 1-5 ¶¶ 15–16.

Second, the email in which CCI laid out its anticipated 1% to 2% fee was repudiated by both TMS and Westport.  *See* Doc. 1-6; Doc. 1-7; Doc. 1-8.  Indeed, shortly after Pyle sent the email on the afternoon of September 30, 2020, TMS responded with adamant objections.  Doc. 1-7 at 2.  Shevlin specifically stated that "TMS Re has not engaged or contracted with Cypress Creek Intermediaries (CCI), or Andy Pyle, in any capacity."[10]  *Id.*  CCI acknowledged this repudiation.  *See* Doc. 1-8 at 2–3.  Additionally, McGrath stated that "Swiss Re has a very specific engagement process and obviously did not engage Cypress for services since there would be a contract to that end.  Swiss Re will acknowledge specific relationships, *as we thought was the case between TMS and Cypress*.  However, since TMS also did not engage Cypress to seek out partnerships, I am not certain where we go."  Doc. 1-8 at 2 (emphasis added); *see also* Doc. 1-6 at 2–3 (indicating Westport's understanding that it had been engaged *by TMS* for strategic discussions that could potentially lead to a sale and requesting that the NDA be updated to show that CCI represented TMS).  That is consistent with McGrath's September 29, 2020, email, wherein she asked CCI to edit the NDA to reflect Westport's understanding that CCI was in fact TMS' representative.  Doc. 1-6 at 2–3.

---

[9] Importantly, in an email dated September 29, 2020, McGrath asked CCI to edit the NDA to reflect that CCI had been engaged by TMS.  Doc. 1-6 at 3.

[10] Critically, the email demands that "CCI and Andy Pyle shall immediately stop having any discussions about TMS Re in the marketplace, as requested in my email (below) of June 29, 2020."  Doc. 1-7 at 2.  While the June 29, 2020, email was not attached to the complaint, this language suggests that TMS had previously disavowed any intent to work with CCI on an acquisition deal.

All told, the exhibits that CCI attached to its complaint render its breach claim implausible because they show that no contract regarding the "Westport Acquisition" was ever formed. *See generally* Doc. 1 ¶ 43. They demonstrate that there was no clear offer, acceptance, consideration, mutual assent, and mutual intent to be bound by the terms of the NDA, or the email from Pyle indicating the 1% to 2% anticipated fee, or both. *Verio, Inc.*, 356 F.3d at 427.

CCI's arguments to the contrary are unavailing. It muddies the distinction between the NDA—which was signed by Westport on September 11, 2020—and its September 30, 2020, email—which, for the first time, indicated CCI's anticipated 1% to 2% facilitation fee—in order to make two main arguments. *First*, CCI argues that it provided an adequate offer, containing all necessary terms of the purported facilitation agreement, Doc. 22 at 11–19; and *second*, it argues that Westport did not repudiate the "agreement" until three weeks after its executives had already executed it, *id.* at 19. But the exhibits simply do not permit these allegations to survive Westport's motion to dismiss. For all the reasons stated herein, the NDA simply does not amount to an agreement, by Westport, to pay Cypress Creek a fee in connection with the Westport Acquisition. Nor is the September 30 email an enforceable contract. Indeed, even if it contains the requisite terms to establish a valid offer regarding the brokering arrangement, that offer was quickly rejected by Westport mere days later, on October 2, 2020. Doc. 1-8 at 2. Even taking these documents together as a sequence of writings regarding the alleged agreement, the exhibits render CCI's allegations implausible. *Beauvoir*, 794 F.3d at 248.

Accordingly, CCI's breach claim, Count I, is dismissed. Because the Court concludes that there was no valid contract, it need not discuss the parties' Statute of Frauds arguments in regard to this claim. *See* Doc. 21 at 18–20; Doc. 22 at 22–23; Doc. 24 at 9–11.

### C.  Unjust Enrichment and *Quantum Meruit* Claims

In addition to its contractual claims, CCI brings claims for unjust enrichment and *quantum meruit*.  It argues that it has adequately pleaded the requirements of these claims under New York law because it alleged that the Westport benefited at CCI's expense, and equity and good conscience require compensation.  Doc. 22 at 24.  Westport argues that CCI cannot recover in quasi-contract because the claims are barred by the Statute of Frauds and are otherwise duplicative of CCI's breach claims.  Doc. 21 at 20–22.

To state a claim for unjust enrichment under New York law, a plaintiff must prove that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover.  *Briarpatch Ltd. v. Phx. Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004), *cert. denied*, 544 U.S. 949 (2005).  "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'"  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 258 A.D.2d 905 (4th Dep't 1999)).  Under New York law, an unjust enrichment claim is precluded if a valid contract covers the subject matter of the dispute.  *First Hill Partners, LLC v. Bluecrest Cap. Mgmt.*, 52 F. Supp. 3d 625, 634 (S.D.N.Y. 2014).  However, when "plaintiff's unjust enrichment claim is derived from the same set of facts as plaintiff's breach of contract claim, plaintiffs may plead alternative theories of liability," so long as the existence or enforceability of the underlying contract is in dispute.  *See Speedfit LLC v. Woodway USA, Inc.*, 53 F. Supp. 3d 561, 580 (E.D.N.Y. 2014); *see also ESI, Inc. v. Coastal Power Prod. Co.*, 995 F. Supp. 419, 436 (S.D.N.Y. 1998) (denying motion to dismiss an unjust enrichment claim where the defendant contested the validity and enforceability of the contract).   That is because only a *valid* contract between the parties, which relates to the same subject matter as the unjust enrichment claim, bars the quasi-contract relief.  *See generally Morgan Stanley & Co. Inc. v. Peak Ridge Master SPC Ltd.,* 930 F. Supp. 2d 532, 545–46 (S.D.N.Y. 2013) (collecting cases); *Miller v.*

*Schloss,* 218 N.Y. 400, 407 (1916) (noting that quasi-contract "is an obligation which the law creates, in the absence of any agreement," and that it is defined by "[d]uty, and not a promise or agreement or intention of the person sought to be charged").

"In order to recover in quantum meruit under New York law, a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 1995) (citation omitted).

N.Y. General Obligations Law § 5-701(a)(10) adds an additional layer to the allegations and proof a plaintiff must offer to pursue a claim for unjust enrichment and in *quantum meruit*. By its plain language, the requirement in the Statute of Frauds that every "agreement, promise or undertaking" be in writing, or else it is void, applies equally "to a contract *implied in fact or in law* to pay reasonable compensation." N.Y. Gen. Oblig. Law § 5-701(a)(10) (emphasis added). The "'implied in fact or in law' language was added to the statute in 1964 to make clear that the statute of frauds applies to quantum meruit claims." *Snyder v. Bronfman*, 13 N.Y. 3d 504, 508 (2009) (citation omitted); *see Chardan Cap. Mkts.*, 2018 WL 3733948, at *3 ("The New York Court of Appeals has made clear that section 5-701(a)(1) applies to claims for quantum meruit and unjust enrichment"). Accordingly, quasi-contract claims based upon a purported agreement to pay compensation for the negotiation of a corporate acquisition will fail if they do not satisfy the Statute of Frauds. *Wolet Cap. Corp. v. Walmart Inc.*, No. 18 Civ. 12380 (LJL), 2021 WL 242297, at *10 (S.D.N.Y. Jan. 25, 2021).

Westport's motion to dismiss CCI's quasi-contract claims is denied. As a preliminary matter, the claims are not precluded as duplicative of CCI's breach of contract claim. *See Speedfit LLC*, 53 F. Supp. 3d at 580; *Morgan Stanley & Co. Inc.*, 930 F. Supp. 2d at 545 (emphasizing that the existence of a *valid and enforceable* contract precludes an unjust enrichment claim relating to the subject matter of the contract).

16

Indeed, the Court has concluded that no valid and enforceable contract existed between the parties here.

Nor are CCI's quasi-contract claims barred by the Statute of Frauds.  Viewing the facts in the light most favorable to CCI, Westport agreed to work with CCI as a facilitator to a possible acquisition of TMS.  *See Ginsberg Mach. Co.*, 341 F.2d at 828 (noting that, to satisfy the Statute of Frauds, a writing must:  (1) be subscribed to by the party charged; (2) designate the parties to the agreement; (3) identify and describe the subject matter; and (4) establish, either expressly or by reasonable implication, all the essential terms of the agreement).  Indeed, when Pyle emailed McGrath on June 29, 2020, to inquire into Westport's interest in acquiring another insurance business, McGrath answered that Westport "would have an interest," and she asked about "next steps."  Doc. 1-2 at 2; *see also* Doc. 1 ¶¶ 16–21.  According to the facts alleged in the complaint, this was in the context of prior "completed" deals between Pyle and McGrath.  Doc. 1 ¶ 18–19.  McGrath thereafter agreed to meet with CCI and TMS regarding an opportunity "to strategically partner with and/or acquire TMS re."  Doc. 1-3 at 2; Doc. 1 ¶¶ 23–25.  A three-way telephone conference took place on September 1, 2020, at which point "the parties discussed an acquisition of TMS by Westport, and the need for a nondisclosure agreement to protect the confidentiality of the deal and to recognize Cypress Creek as the 'representative regarding the negotiations,'" and a "facilitator" of the transaction.  Doc. 1 ¶¶ 25–27.  Thereafter, Pyle emailed McGrath about the call and attached the NDA, which Westport signed.  Doc. 1 ¶¶ 28–29; Doc. 1-4 at 2–3; *see also* Doc. 1-5.

Taking all these elements together, CCI has plausibly pleaded its unjust enrichment and *quantum meruit* claims.  The facts alleged are sufficient to show, at this stage, that Westport may be liable under either or both quasi-contract theories.  Indeed, the complaint and its exhibits allow the Court to draw the reasonable inference that Westport agreed to work with CCI to explore a possible acquisition of TMS, and that it took various steps to do so with the understanding that CCI would be compensated for its

services. *See Iqbal*, 556 U.S. at 678; *see also* Doc. 1 ¶¶ 16–34. Westport's contention that "the absence of a writing requires dismissal of Cypress Creek's quasi-contract claims" is unpersuasive here, given the various emails, phone calls, and exchanges between the parties wherein Westport agreed to engage with CCI and TMS pursuant to CCI's facilitation efforts, as well as McGrath and Pyle's prior history of engaging in and completing similar deals. Doc. 21 at 21; *see generally* Doc. 1 ¶¶ 18–19.

Accordingly, Westport's motion is denied as to Counts II and III of CCI's complaint.

### D. Claim for Breach of Covenant of Good Faith & Fair Dealing

Westport also moves to dismiss CCI's claim for breach of covenant of good faith and fair dealing. Simply put, it emphasizes that, "without a contract, there is no implied covenant." Doc. 21 at 22. CCI counters that it has indeed "properly alleged the existence of an enforceable contract." Doc. 22 at 25.

Under New York law, the duty of good faith and fair dealing "is implied in every contract, to the effect that neither party 'shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *CCR Int'l, Inc. v. Elias Grp., LLC*, No. 15 Civ. 6563 (PAE), 2021 WL 1253892, at *4 (S.D.N.Y. Apr. 5, 2021) (citing *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006)). Critically, "[t]he extent of the obligation is based on the agreement between the parties, such that *no duty* of good faith and fair dealing *exists absent such an agreement*." *Advanced Oxygen Therapy Inc. v. Orthoserve Inc.*, 572 F. Supp. 3d 26, 34–35 (S.D.N.Y. 2021) (emphasis added). In other words, where the Court has concluded that there is no contract as a matter of law, there is no duty of good faith and fair dealing. *See, e.g.*, *Wachovia Bank, Nat. Ass'n v. Mortgage Lenders Network USA, Inc.*, No. 03 Civ. 8809 (NRB), 2005 WL 578942, at *6 n.3 (S.D.N.Y. Mar. 10, 2005) (concluding that because there was no contract, there was no duty of good faith and fair dealing).

As set forth above, the Court concludes that the complaint failed to allege the existence of an enforceable fee agreement regarding the alleged "Westport Acquisition." *See* Doc. 1 ¶ 43.  Accordingly, this claim, Count IV, is dismissed.  *Orthoserve Inc.*, 572 F. Supp. 3d at 34–35.

### E.  Fraud Claim

Westport further moves to dismiss CCI's fraud claim.  It contends that CCI's allegations do not state a claim for fraud, and CCI fails to state with particularity the circumstances constituting fraud.  Doc. 21 at 27 (citing Fed. R. Civ. P. 9(b)).  CCI argues that it sufficiently met the pleading standards to survive Westport's motion to dismiss. Doc. 22 at 29–30.

To state a fraud claim under New York law, a claimant must allege that "(1) [the other party] made a representation as to a material fact; (2) such representation was false; (3) [the other party] intended to deceive; (4) [claimant] believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance [claimant] sustained pecuniary loss[.]"  *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012), *as amended* (June 13, 2012) (summary order) (internal citation omitted).  The Second Circuit has instructed that where fraud claims are brought alongside contract claims, the fraud claims may only proceed where they will "(i) demonstrate a legal duty separate from the duty to perform under the contract; (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."  *Bridgestone/Firestone, Inc. v. Recovery Credit Servs. Inc.*, 98 F.3d 13, 20 (2d Cir. 1996).

CCI points to two main "lies" purportedly made by Westport that induced it to take actions and suffer pecuniary losses:  *first*, that Westport "blatantly lied to Cypress about not being interested in purchasing TMS (after telling Cypress it wanted to move 'quickly' to purchase TMS," Doc. 22 at 29; and *second*, that Westport "falsely disavowed

any relationship with Cypress (to avoid having to pay Cypress a fee) when all the while Westport was actively concealing from Cypress its ongoing negotiations with TMS about the very deal Westport feigned having no interest in pursuing," *id.* (citing Doc. 1 ¶¶ 31, 33, 36–37, 42, 48).  *See also* Doc. 1 ¶¶ 28, 37, 40, 42, 44, 48, 57, 61.[11]

Even taking CCI's allegations as true, they fail to sufficiently allege fraud under New York law.  That is because the complaint fails to plausibly state how either one of the purported "lies" (1) caused CCI to believe and justifiably rely upon misstatements *and* (2) induced CCI to engage in a certain course of conduct.  *See Stephenson*, 482 F. App'x at 622; *see also* Doc. 21 at 28 ("[T]he alleged misrepresentation could not possibly have *induced* Cypress Creek's agreement.) (citation omitted).  Indeed, as Westport notes, the alleged misrepresentation about Westport's interest in purchasing TMS, and its September 29, 2020, statement that it hoped to move "quickly," could not have induced CCI to enter into an agreement that, *according to CCI*, already existed as of that date. Doc. 1 ¶ 36 (noting that McGrath's September 29, 2020, indicated that Westport was interested in proceeding "quickly"); Doc. 1 ¶ 29 (alleging that the "Westport Agreement was executed on September 11, 2020").  Nor does the complaint allege that the purported "lie" as to Westport's "disavowal" of its interest in pursuing the acquisition, Doc. 1 ¶¶ 56–58, induced CCI to do anything.  *See* Doc. 1 ¶¶ 59–61; *see also* Doc. 21 at 28 ("Tellingly, Cypress Creek does not allege that it did *anything* after receiving the supposedly-key October 2 email.") (citation omitted).

Contrary to its contentions, CCI fails to meet the "formal sufficiency" pleading requirements of Rule 12(b)(6) in relation to Westport's purported fraud.  *Berv*, 644 F.3d at 130.  Accordingly, Count VI of the complaint is also dismissed.

---

[11] CCI cites these provisions in support of its purported allegations demonstrating reliance and damages. Doc. 22 at 29.

### F.  Massachusetts General Laws Chapter 93A Claim

Finally, Westport moves to dismiss CCI's claim for unfair competition and/or deceptive acts or practices, which was brought pursuant to Massachusetts General Law Chapter 93A Section 11.  It argues that CCI failed to show that any conduct by Westport occurred within Massachusetts, as the statute requires, and also failed to allege facts that constitute unfair or deceptive acts or practices.  Doc. 21 at 23.  CCI contends that "Westport's arguments are frivolous and overblown."  Doc. 22 at 26.  The Court dismisses this claim for the reasons set forth below.

Chapter 93A of the Massachusetts General Laws declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A § 2(a).  "Chapter 93A is a catch-all statute that makes unlawful "[u]nfair methods of competition *and* unfair *or* deceptive acts or practices in the conduct of any trade or commerce."  *Full Spectrum Software, Inc. v. Forte Automation Sys., Inc.*, 858 F.3d 666, 676 (1st Cir. 2017) (citing Mass. Gen. Laws ch. 93A, § 2) (emphases in original).  "As each of chapter 93A's constituent parts is itself distinct, a chapter 93A claim may be predicated on an underlying claim of unfair methods of competition, unfair acts or practices, or deceptive acts or practices."  *Id.* (citing *Serv. Publ'ns, Inc. v. Goverman*, 487 N.E.2d 520, 527 (1986) ("The jury could have found [the defendant's] business practices to be unfair without being deceptive or fraudulent.")).  Critically, to bring a Chapter 93A claim, the "unfair method of competition or the unfair or deceptive act or practice" must have "occurred primarily and substantially within the commonwealth."  Mass. Gen. Laws ch. 93A, § 11.

CCI's deceptive acts claim fails to sufficiently allege a violation of Chapter 93A Section 11.  The Court agrees with Westport that CCI failed to allege that Westport engaged in *any* deceptive act or practice within the state of Massachusetts.  Doc. 21 at 23–24.  Indeed, the complaint is devoid of such a statement.  The *only* allegation regarding the state of Massachusetts pertains to a choice-of-law clause within the

21

unexecuted Westport-TMS NDA, which merely stated that *the NDA* would be governed by Massachusetts law.  Doc. 1 ¶ 32; Doc. 1-5 ¶ 13.  However, the NDA's provision does not in any way speak to the location where Westport allegedly acted unfairly or deceptively in regard to the "Westport Acquisition," nor does the complaint elsewhere allege that Westport acted within the state of Massachusetts.  Doc. 1 ¶ 6; *but see* Mass. Gen. Laws ch. 93A, § 11 ("No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.").  Additionally, at the time that the discussions at issue took place, the record shows that all representatives from the contracting parties were outside of Massachusetts:  McGrath, Westport's representative in the acquisition discussions, was located in Windsor, Connecticut, and Pyle, CCI's representative, was located in Heathrow, Florida.  Doc. 1-2 at 2; *see also* Doc. 1-4 at 2 (showing that another Westport executive, Tom Gibbons, was located in Marlton, New Jersey, during the relevant time period).

Taking together the complaint and the attached exhibits, CCI simply fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  The complaint and the incorporated exhibits fail to provide a plausible factual path for CCI to plead its unfair or deceptive acts or practices claim under Massachusetts law.  *Beauvoir*, 794 F.3d at 248 (concluding that a "threadbare recital" in the complaint was contradicted by the attached exhibit, and Plaintiffs thus failed to plausibly allege their claim).

Accordingly, Count V of the complaint alleging a violation of Massachusetts General Law Chapter 93A is similarly dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Westport's motion to dismiss is GRANTED in part and DENIED in part.  Specifically, Counts I, IV, V, and VI of the complaint are dismissed. CCI's motion for oral argument is DENIED as moot.  Doc. 25.

The parties are directed to appear for a telephonic status conference at 3:30 PM on February 23, 2023.  The parties are directed to dial (877) 411-9748 and enter access code 3029857#.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 20.

It is SO ORDERED.

Dated:    February 6, 2023
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.