UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CYPRESS CREEK
INTERMEDIARIES, INC.,

              Plaintiff,

– *against* –

WESTPORT INSURANCE CORP.,

              Defendant.

**ORDER**

22-cv-3649 (ER)

RAMOS, D.J.:

    Cypress Creek Intermediaries, Inc., has moved to compel Westport Insurance Corp. to (1) remove the attorneys' eyes only (AEO) designation from certain documents produced in discovery, and (2) respond to two of Cypress Creek's requests for production. For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART. Cypress Creek's request for oral argument, Doc. 42, is DENIED as moot.

## I. BACKGROUND

### A. Factual Background

    The facts—drawn from the allegations in the complaint and attached documents—are set out in detail in the Court's previous opinion ruling on Westport's motion to dismiss. *Cypress Creek Intermediaries, Inc. v. Westport Ins. Corp.*, 2023 WL 1779641, at *1–4 (S.D.N.Y. Feb. 6, 2023); *see* Doc. 26. The Court provides an abbreviated version of the factual background to lend context to this discovery dispute.

    Cypress Creek, a broker, alleges that it facilitated an agreement for Westport to acquire TMS Re, Inc. (TMS), another insurance business. *Cypress Creek*, 2023 WL 1779641, at *1. Westport is part of the Swiss Re organization. *See id.* at *2 n.4; *see also* Doc. 40 at 2. Cypress Creek's president, Andrew Pyle, reached out to Westport executive Katie McGrath in June 2020 about the prospect of an acquisition. *Cypress Creek*, 2023

WL 1779641, at *1–2. A series of calls and emails followed, and the parties—Cypress Creek, Westport, and TMS—held a phone conference on September 1, 2020. *Id.* at *2. They discussed the need for a nondisclosure agreement "to protect the confidentiality of the deal and to recognize Cypress Creek as the 'representative regarding the negotiations.'" *Id.* (quoting Doc. 1 ¶ 26).

Some confusion followed as to Cypress Creek's role in the transaction. In a September 29, 2020, email mentioning the nondisclosure agreement, McGrath noted Westport's understanding that Cypress Creek had been "engaged by TMS for strategic discussions that could potentially lead to a sale post July 2021." *Id.* at *3 (emphasis omitted) (quoting Doc. 1-6 at 3). Pyle responded that Cypress Creek did not need to be recognized as a "representative" of Swiss Re or TMS—but it did need to be recognized as the "facilitating party." *Id.* (quoting Doc. 1-6 at 2). Pyle added that Cypress Creek would expect "a 1%-2% facilitation fee on all gross premium which would flow through the Swiss Re issuing carrier platform by TMS Re." *Id.* (quoting Doc. 1-6 at 2).

TMS CEO Michael Shevlin then emailed Cypress Creek and Westport representatives, stating that TMS was not looking to be acquired or to have any discussions regarding acquisition. *Id.* Shevlin also asserted that TMS had not engaged Cypress Creek in any capacity. *Id.* And he said that Cypress Creek would need a separate agreement between Cypress Creek and Swiss Re "that clearly articulates your role with Swiss Re, and any potential for compensation." *Id.* (quoting Doc. 1-7 at 2).

In a follow-up email, McGrath stated that "Swiss Re has a very specific engagement process and obviously did not engage Cypress for services." *Id.* at *4 (quoting Doc. 1-8 at 2). She noted that Swiss Re would "acknowledge specific relationships, as we thought was the case between TMS and Cypress." *Id.* (quoting Doc. 1-8 at 2). But "since TMS also did not engage Cypress to seek out partnerships, I am not certain where we go." *Id.* (quoting Doc. 1-8 at 2).

Cypress Creek alleges that Westport and TMS "abruptly disavowed any relationship with Cypress Creek and falsely stated that neither party had any interest in moving forward with the Westport Acquisition." *Id.* (quoting Doc. 1 ¶ 48). Westport and TMS continued negotiations, however, and completed the acquisition after July 2021. *Id.* Cypress Creek asserts that it "earned a fee owed by Westport, but no fee was ever paid." *Id.* (quoting Doc. 1 ¶ 61).

### B. Procedural History

On May 5, 2022, Cypress Creek filed a complaint against Westport alleging several causes of action. Doc. 1. Westport moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Doc. 20.

The Court granted in part and denied in part the motion to dismiss. *Cypress Creek*, 2023 WL 1779641, at *12. Specifically, the Court dismissed Cypress Creek's claims for breach of contract, breach of covenant of good faith and fair dealing, fraud, and unfair and deceptive acts and practices under Massachusetts General Law Chapter 93A. *Id.* at *6–8, *10–12.

The Court also concluded, however, that Cypress Creek had stated a claim for unjust enrichment and *quantum meruit*. *Id.* at *8–10. Under New York law, unjust enrichment requires a plaintiff to show that: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Id.* at *8 (citing *Briarpatch Ltd. v. Phx. Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004)). To recover on a *quantum meruit* claim, a plaintiff must establish: "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Id.* at *9 (quoting *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)).

Cypress Creek sufficiently alleged that Westport might be liable under either or both quasi-contract theories. *Id.* at *10. "Viewing the facts in the light most favorable to [Cypress Creek]," the Court explained, "Westport agreed to work with [Cypress Creek] as a facilitator to a possible acquisition of TMS." *Id.* at *9. When Pyle reached out to inquire about Westport's interest in an acquisition, McGrath responded that Westport "would have an interest" and asked about "next steps." *Id.* (quoting Doc. 1-2 at 2). The three parties then met via phone conference on September 1, 2020. *Id.* They discussed the acquisition and "'the need for a nondisclosure agreement to protect the confidentiality of the deal and to recognize Cypress Creek as the "representative regarding the negotiations,"' and a 'facilitator' of the transaction." *Id.* (quoting Doc. 1 ¶¶ 25–27).

Based on these facts, the Court could infer that "Westport agreed to work with [Cypress Creek] to explore a possible acquisition of TMS, and that it took various steps to do so with the understanding that [Cypress Creek] would be compensated for its services." *Id.* at *10. The Court also found that the absence of a writing was not dispositive "given the various emails, phone calls, and exchanges between the parties wherein Westport agreed to engage with [Cypress Creek] and TMS pursuant to [Cypress Creek's] facilitation efforts, as well as McGrath and Pyle's prior history of engaging in and completing similar deals." *Id.* Accordingly, the Court denied Westport's motion to dismiss the unjust enrichment and *quantum meruit* claims. *Id.*

On September 19, 2023, Cypress Creek filed this motion to compel. Doc. 36. Cypress Creek asks the Court to order (1) that AEO designations be removed from certain documents produced by Westport, and (2) that Westport respond to two of Cypress Creek's requests for production. Doc. 37 at 1.

## II.   DISCUSSION
### A.   AEO Designations

The first issue is the designation of certain documents as AEO. A court may, for good cause, issue an order "requiring that a trade secret or other confidential research,

4

development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G). "The disclosure of confidential information on an 'attorneys' eyes only' basis is a routine feature of civil litigation involving trade secrets." *In re City of New York*, 607 F.3d 923, 935 (2d Cir. 2010). This practice "prevent[s] a *party* from viewing the sensitive information while nevertheless allowing the party's *lawyers* to litigate on the basis of that information." *Id.* at 936. "The party seeking protection for its data bears the burden of establishing good cause for the issuance and continuation of a protective order." *Paul Rudolph Found., Inc. v. Paul Rudolph Heritage Found.*, No. 20 Civ. 8180 (CM) (SLC), 2023 WL 1515773, at *2 (S.D.N.Y. Feb. 3, 2023) (citation omitted). A court asked to enter a protective order with an AEO provision to protect confidential commercial information "must balance the risk of economic harm to the producing party against the requesting party's need for the information." *Rodo Inc. v. Guimaraes*, No. 22 Civ. 9736 (VSB), 2022 WL 17974911, at *1 (S.D.N.Y. Dec. 27, 2022) (citation omitted).

On June 12, 2023, Westport proposed a protective order to govern the production of confidential documents. Doc. 37 at 5; *see* Doc. 38-4. As relevant here, that proposal allowed the parties to designate material as "Confidential" or "Attorneys' Eyes Only." Doc. 38-4 at 4. Documents marked "Confidential" could be viewed by "[r]epresentatives, agents, employees or in-house counsel of the named parties," *id.* at 5; documents marked "Attorneys' Eyes Only" could be viewed by those individuals only upon "advanced agreement among the parties," *id.* at 7. Under these terms, Cypress Creek would need Westport's consent to show AEO documents to Andrew Pyle, the president of Cypress Creek and "the only person at Cypress Creek with personal knowledge about the facts of this case." Doc. 37 at 6.

The proposed protective order was not executed. *Id.* at 7. Cypress Creek agreed that the parties would produce documents pursuant to that proposal but reserved its right to object to any documents marked AEO. *Id.*; *see also* Doc. 38-5; Doc. 40 at 5 (stating

5

that the parties "have agreed to comply [with the draft protective order] pending this Court's decision"). In its initial production, Westport designated some documents as AEO. Doc. 37 at 7; Doc. 40 at 5. Cypress Creek now moves to compel Westport to change those designations from "Attorneys' Eyes Only" to "Confidential" so Pyle can view the documents. Doc. 37 at 1. Westport submitted copies of eight AEO documents for the Court's *in camera* review. The challenged documents can be divided into two categories: (1) a "producer list," and (2) versions of Swiss Re's internal memorandum and related emails concerning the approval of the TMS acquisition.

   *1. Producer List*

First, one of the AEO documents lists "producers used by Swiss Re and TMS Re." Doc. 40-5 ¶ 4. According to a Westport executive's declaration, "producers are sources of business on which insurers like Westport rely. Lists of producers are therefore akin to customer lists." *Id.* ¶ 6. The executive also asserts that Westport "protects the confidentiality of its producer lists" and "does not willingly disclose these lists." *Id.* ¶ 7. The lists would be "extremely valuable to a competitor," who could use them to try to take business away from Westport. *Id.* ¶ 8. And the lists would likewise be "highly valuable to a broker like Cypress Creek." *Id.* ¶ 9. Cypress Creek's connections in the insurance industry "would give it many opportunities either to share the information with Westport's competitors or to use it to advance its own business interests." *Id.* Based on these assertions, the Court finds that Westport has shown good cause for the producer list to be designated AEO.

On the other side of the equation, Cypress Creek fails to articulate why Pyle needs access to the list. Cypress Creek states in generic terms that "[a]ll of [the AEO] documents . . . are indicative of the benefit Westport anticipated to receive by acquiring TMS Re." Doc. 37 at 12. But it does not elaborate on why it is necessary for Pyle to view the list of producers—or why his lack of access to the list will affect Cypress

Creek's ability to litigate this case. Nor does Cypress Creek offer any explanation as to how the producer list might be material to Pyle's testimony.

In addition, Cypress Creek has not disputed Westport's characterization of the producer list as comparable to a customer list. Courts regularly treat customer lists as confidential and find that AEO designations are appropriate. *See, e.g.*, *Rodo*, 2022 WL 17974911, at *1–2 (collecting cases and concluding that "permitting parties to designate names, contact information, and business information of [plaintiff's] data providers, dealers, customers, and brokers, as well as lists containing this information as 'attorneys' eyes only' appropriately balances the needs of the parties"); *Asch/Grossbardt Inc. v. Asher Jewelry Co.*, No. 02 Civ. 5914 (SAS), 2003 WL 660833, at *2–3 (S.D.N.Y. Feb. 28, 2003) (noting that disclosure of customer lists to competitors "could potentially result in economic harm to the disclosing party" and applying AEO designation to customer list). Cypress Creek does not provide any reason to depart from that practice here.

The motion to compel is denied as to the producer list.

2. *Approval Memorandum and Emails*

The other documents designated AEO are versions of Swiss Re's internal approval memorandum for its acquisition of TMS, as well as related emails discussing the approval memo and potential modifications of its analysis. *See* Doc. 40 at 5. Cypress Creek asserts that these documents contain "presentations to the executive committee on projections of how TMS Re will perform for the following five years, projected purchase price, and the integration plan for assimilating TMS Re." Doc. 37 at 12. The documents also include "updated presentations amended with revised numbers and issues that arose while the deal was negotiated." *Id.*

Westport contends that the approval memo and emails "are sensitive because they show how Westport and Swiss Re evaluate deals like the TMS acquisition." Doc. 40 at 12. As the Westport executive's declaration explains, the approval memo "provides a roadmap to Swiss Re's analysis of a potential acquisition." Doc. 40-5 ¶ 11. In particular,

the memo includes "the financial analysis on which Swiss Re based its decision to go forward," and it "analyzes deferred compensation terms offered to the sellers." *Id.* This information "would provide a future acquisition target or rival bidder deep insight into how Swiss Re approaches such acquisitions." *Id.* ¶ 12. Cypress Creek, which "claims to arrange similar deals regularly, . . . could use the information in a future deal either with Swiss Re, or in which Swiss Re was bidding." Doc. 40 at 12–13; *see also* Doc. 40-5 ¶ 12 ("Given that Cypress Creek professes to be active in this market, Cypress Creek could well be able to use the information against Swiss Re.").

For its part, Cypress Creek says these documents "reflect the views of how Westport's staff believed it would benefit from acquiring TMS Re." Doc. 37 at 12; *see also id.* (asserting that the documents "are indicative of the benefit Westport anticipated to receive by acquiring TMS Re"). "Because the benefit received by Westport is a core element of Cypress Creek's quantum meruit and unjust enrichment causes of action, they are highly relevant to Cypress Creek's claims in this matter." *Id.*

While it may be true that the documents are relevant, that itself is not sufficient to justify removal of the AEO designations. The question is whether *Pyle* needs to view them—and Cypress Creek has failed to provide any sufficient justification. It is not enough to state, as Cypress Creek does, that Pyle is a "vital witness" who will testify about "industry standards, how similar deals he has facilitated were evaluated and how the facilitator of these various deals are compensated." *Id.* at 13. Pyle can testify about all those subjects regardless of whether he has access to the AEO documents.

Cypress Creek further argues that the allegedly confidential material is "significantly outdated" because the deal was completed more than a year and a half ago. *Id.* As Westport points out, however, the risk of disclosing this material lies in its *future* value to Cypress Creek. Doc. 40 at 13; *see also* Doc. 40-5 ¶ 12 ("Such information would provide a future acquisition target or rival bidder deep insight into how Swiss Re approaches such acquisitions.").

8

Westport has explained that the approval memo and related emails reveal its internal approach to potential acquisitions and that such information could be used by a competitor to Westport's detriment in future transactions. Since Cypress Creek has not persuasively explained why Pyle needs access to the documents, the motion to compel is also denied as to the approval memo and emails.

### B. Requests for Production

Cypress Creek also moves to compel Westport to respond to two requests for production. Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Rule 26's language indicates that, "[w]hile not unlimited, relevance, for purposes of discovery, is an extremely broad concept." *Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 Civ. 2106 (ER), 2019 WL 171987, at *2 (S.D.N.Y. Jan. 11, 2019) (alteration in original) (quoting *Joseph v. Gnutti Carlo S.p.A.*, No. 15 Civ. 8910 (AJN), 2016 WL 4083433, at *1 (S.D.N.Y. July 25, 2016)). "Though the burden of demonstrating relevance is on the party seeking discovery, if a party objects to discovery requests, that party bears the burden of showing why discovery should be denied." *Shiber v. Centerview Partners LLC*, No. 21 Civ. 3649 (ER), 2023 WL 3071554, at *2 (S.D.N.Y. Apr. 25, 2023) (internal citation omitted).

Here, Cypress Creek has requested that Westport produce:

- All Documents and Communications concerning Westport's acquisition of TMS, specifically: all initial requests made by Westport for documents from TMS to evaluate whether Westport wanted to acquire TMS; all documents utilized to assess the value of the acquisition of TMS; all documents utilized to formulate an offer to acquire TMS; and all deal closing documents not previously produced. Doc. 37 at 15–16; *see* Doc. 38-8 at 3 (Request No. 1).

- All Documents and Communications between Katie McGrath, Michael Shevlin, and/or Travis Micucci regarding the acquisition of TMS between June 1, 2020 and December 31, 2021, including but not limited to initial deal discussions, Westport's offer to purchase TMS, and any introductions McGrath initiated between Shevlin and/or Micucci and other members of the Westport organization. Additionally, all Documents and Communications between Westport, TMS, Katie McGrath and/or Michael Shevlin and Travis

>Micucci between June 1, 2020 and December 31, 2021 regarding the initial offer by Westport to purchase TMS and all negotiations regarding what Westport would pay to acquire TMS. Doc. 37 at 18–19; *see* Doc. 38-8 at 3 (Request No. 3).

Cypress Creek insists that the requested documents are relevant to its quasi-contract claims because they will "evidence the value of the acquisition of TMS Re and how Westport itself viewed that value." Doc. 37 at 16; *see also id.* at 19–20. In other words, the documents are relevant to determining the value of the benefit conferred on Westport. *Id.* at 16, 19–20.

Westport argues that it has already produced any documents that might be relevant to the quasi-contract claims. Doc. 40 at 7. Specifically, Westport asserts that it has produced: "(1) its documents concerning communications with or about [Cypress Creek], which bear on the service that [Cypress Creek] allegedly performed; and (2) the Stock Purchase Agreement governing the TMS acquisition, which indicates the price paid for TMS." *Id.* According to Westport, documents concerning the negotiation of the transaction are not relevant to the value of Cypress Creek's purported services. *Id.* at 8. And Westport says the best evidence of its valuation of the deal is the stock purchase agreement—which it has already produced. *Id.* at 9. That agreement provides the price Westport paid for TMS and is "effectively the parties' arms-length agreement as to the value of the company." *Id.* "How the parties *arrived* at that price," Westport asserts, "will shed no further light on that value." *Id.* Since the most it can hope to recover is a percentage of the purchase price, Cypress Creek "has no basis for valuation discovery that goes *beyond* the purchase price." *Id.* at 10.

Cypress Creek responds that the purchase price alone is not sufficient. Doc. 41 at 4. Instead, Cypress Creek seeks information as to "the ultimate valuation of the deal and of any points made during the negotiation process, such as future earn-outs and employment contracts, which may have impacted the ultimate price paid to acquire TMS." *Id.* And Cypress Creek notes that in similar deals, it has been compensated "not

10

on an hourly basis, but based on a percentage of the value or premium." *Id.* at 5–6; *see also* Doc. 41-1 ¶¶ 7–8.

It is too early to say how the measure of damages—if any—will be calculated in this case. Both parties have pointed to case law indicating that the benefit conferred on the defendant in a quasi-contract case may be determined with reference to the purchase price. *See, e.g.*, *Klein ex rel. SICOR, Inc. v. Salvi*, No. 02 Civ. 1862 (AKH), 2004 WL 596109, at *5 (S.D.N.Y. Mar. 30, 2004) ("In certain types of *quantum meruit* recoveries, for example real estate brokers and business finders, compensation is typically awarded in relation to the value of the property, or business, which the broker, or finder, has brought to a willing buyer and seller."); *Carlino v. Kaplan*, 139 F. Supp. 2d 563, 565 (S.D.N.Y. 2001) ("Real estate and other business brokers and finders are generally compensated by percentages of the purchase price customary to the locality or the business."). Westport takes these cases to mean that the purchase price alone is sufficient to determine value. Doc. 40 at 9–10. But it is at least conceivable that the final purchase price agreed upon by the parties might have differed from Westport's internal valuation. Cypress Creek notes that documents might reveal points such as "future earn-outs and employment contracts, which may have impacted the ultimate price paid to acquire TMS."[1] Doc. 41 at 4. The Court need not wade into these issues any further at this stage. For now, it is enough to conclude that how Westport valued the deal internally may be relevant to determining the benefit—if any—that was ultimately conferred on Westport.

As written, however, Cypress Creek's requests appear to be broader than necessary. For instance, it is not clear how "all initial requests made by Westport for documents from TMS" or "all deal closing documents," Doc. 38-8 at 3 (Request No. 1), would necessarily be relevant to whether Cypress Creek can satisfy the elements of

---

[1] And indeed here, Pyle suggested that Cypress Creek's fee in facilitating the transaction would be calculated as "1%-2% . . . on all gross premium which would flow through the Swiss Re issuing carrier platform by TMS Re." *Cypress Creek*, 2023 WL 1779641, at *3 (quoting Doc. 1-6 at 2).

unjust enrichment or *quantum meruit*. Similarly, Cypress Creek fails to explain how all documents and communications about "initial deal discussions" or "any introductions McGrath initiated," *id.* (Request No. 3), would help prove its claims. To the extent some of those documents or communications mention Cypress Creek and any role it played in facilitating the deal, they might very well be relevant—but Westport has already agreed to produce such documents. Doc. 40 at 3–4; *see* Doc. 38-3 at 4–5.

Accordingly, the Court will grant narrower versions of the requests. Cypress Creek's requests for production are valid—and Westport must comply with them—insofar as they seek documents "utilized to assess the value of the acquisition of TMS," Doc. 38-8 at 3 (Request No. 1), and documents concerning "negotiations regarding what Westport would pay to acquire TMS," *id.* (Request No. 3). Those documents might show the value of the company Westport was acquiring, which in turn could go toward determining any benefit conferred on Westport. And the burden on Westport to produce these documents should be significantly less than if it were required to produce all documents and communications concerning the acquisition. Cypress Creek's motion to compel is denied with respect to the remainder of Request No. 1 and Request No. 3.

## III.  CONCLUSION

For the foregoing reasons, Cypress Creek's motion to compel is GRANTED IN PART and DENIED IN PART. Cypress Creek's request for oral argument is DENIED as moot.

The Clerk of Court is respectfully directed to terminate the motion, Doc. 36.

It is SO ORDERED.

Dated:   November 20, 2023
         New York, New York

                                                    _____
                                                    EDGARDO RAMOS, U.S.D.J.