UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CYPRESS CREEK
INTERMEDIARIES, INC.,

                              Plaintiff,

              – *against* –

WESTPORT INSURANCE CORP.,

                              Defendant.

**OPINION & ORDER**

22-cv-3649 (ER)

R<small>AMOS</small>, D.J.:

Cypress Creek Intermediaries, Inc. ("Cypress Creek") brought this action against Westport Insurance Corporation ("Westport"), alleging that Westport failed to compensate Cypress Creek in connection with brokering Westport's acquisition of TMS, Re, Inc. ("TMS"), another insurance business. Doc. 1 ¶ 6.

Before the Court is Westport's motion for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. Doc. 62. For the reasons set forth below, the motion is DENIED.

## I.    BACKGROUND

### A.  Factual Background

Michael Shevlin[1] and Travis Micucci purchased TMS stock from Munich-American Holding Corporation ("Munich") for $5.2M on June 12, 2018. Doc. 66-26 at 6, 16. The stock purchase agreement included a "Make Whole Payment" provision, which provided that, if TMS sold its business before the third anniversary of the closing date or accepted a letter of intent within 32 months of the date Shevlin and Micucci

---

[1] Shevlin was the CEO of TMS at all relevant times.

purchased TMS, TMS would have to pay Munich a "make whole payment."[2]  Doc. 66-26 at 42.

Andrew Pyle, the President of Cypress Creek, a reinsurance brokerage firm, first became acquainted with Westport's Head of Accident and Health, Katie McGrath, when she was with a former employer.  Doc. 66 at 7.  According to Cypress Creek, Pyle and McGrath worked together for three consecutive years from 2005 through 2007, when she was with the prior employer.  *Id.*  During those years, Pyle was compensated for his services as a reinsurance broker.  *Id.*  Specifically, as compensation for the services Cypress Creek provided, the third-party company paid Cypress Creek a fee equal to 10 percent of the annual premium the third-party company received from McGrath's former employer.  *Id.* (citing Doc. 66-37 at 2).

When McGrath began working at Swiss Re,[3] Westport's parent company, Pyle reached out to her to restart their relationship.  *Id.* at 7–8.  According to Cypress Creek, in 2019, Pyle pitched several deals to McGrath, but she rejected them because they were "too small" and told Pyle to "[s]end us something larger."  Doc. 66-39 at 48.

Cypress Creek became aware in April 2020 that TMS was interested in being acquired by another insurance company.  Doc. 63 ¶ 12 (Rule 56.1 Statement).

Pyle reached out to McGrath in June 2020 about the possibility of Westport acquiring TMS.[4]  Doc. 63 ¶ 18.  A series of calls and emails followed.  On June 29, 2020, Pyle emailed McGrath saying, "[t]he staff of Cypress Creek Intermediaries looks forward to working with you on a greater basis in 2020" before diving into details about the

---

[2] Cypress Creek asserts that "[t]he Munich 'penalty' provision provided an important backdrop as to why TMS sometimes waffled in pursuing the deal with Westport in 2020," presumably because the payment provision would be triggered by a sale of TMS before July 1, 2021.  Doc. 66 at 6.

[3] Cypress Creek points out that it was also involved in at least one commission-based transaction with Swiss Re.  Doc. 66 at 7.  For example, just 6 months before allegedly facilitating the deal between Westport and TMS, Swiss Re compensated Cypress Creek at five percent of the annual premium generated by that transaction, and, to date, Swiss Re continues to pay Cypress Creek this fee.  Doc. 66-1 ¶¶ 8–10.

[4] All the emails Pyle exchanged with McGrath clearly indicated that he worked for Cypress Creek, as evidenced by his email signature.

acquisition of TMS he was pitching.  Doc. 66-3 at 1.  Specifically, in that email he discussed the opportunity to acquire "a turnkey Employer Stop Loss/Provider Excess [Managing Geneal Underwriter] organization," and McGrath responded saying, "[w]e would have an interest.  Let me know the next steps."  *Id.*  Then, from August 28 to 31, 2020, Pyle and McGrath exchanged emails to set up a three-way call with TMS, Doc. 66-4.  Critically, when Pyle emailed McGrath on August 28, 2020, following a discussion they had the previous week, Pyle shared that Shevlin was willing to listen to an "offer to strategically partner with and/or acquire TMS."  *Id.* at 2.  In that email, Pyle added that Cypress Creek had a long-standing relationship with TMS.  *Id.*  The parties—Cypress Creek, Westport, and TMS—held an introductory phone call on September 1, 2020.  Doc. 63 ¶¶ 27–28.  They did not discuss specifics about the deal during the call because they had not executed a non-disclosure agreement ("NDA").  Doc. 65-31 at 12.

At around the time of the September 1, 2020 call, Pyle testified that he advised McGrath that Cypress Creek would be paid a brokerage fee if reinsurance was placed, but that, otherwise, "a fee would be paid."  Doc. 66-39 at 59.  McGrath's response was, "we're not there yet."  Doc. 65-31 at 14.  Following the call, Pyle prepared a draft NDA intended to be between Westport and TMS.  Doc. 63 ¶ 30.  Paragraph 10 of the NDA, which was titled "Confidentiality/Non-Disclosure and Representative Agreement," states:

> Cypress Creek Intermediaries, Inc., is recognized by [Westport] as representative regarding all negotiations with [TMS] and involving this Proposed Acquisition and/or Strategic Partnership.

Doc. 63 ¶ 32.[5]  McGrath emailed Pyle on September 2, 2020 saying that she "will get the NDA to legal and we can proceed on TMS."  Doc. 66-7 at 3.  McGrath and Thomas Gibbons, Swiss Re's Head of A&H Deal Coordination in North America, eventually

---

[5] Westport argues that Paragraph 10 does not specify who Cypress Creek was representing:  Westport or TMS.  Doc. 64 at 8.  Westport also argues that the NDA is silent as to the compensation Cypress Creek would receive upon completion of the deal.  Doc. 63 ¶ 32.

signed the NDA on behalf of Westport on September 11, 2020.  Doc. 65-9 at 5.  The
NDA, however, was never fully executed, as TMS never signed it.  Doc. 63 ¶ 33.

Pyle sent Westport the executed NDA to Shevlin on September 14, 2020 for
signature.  Shevlin, instead of signing it, privately forwarded the email to Micucci,
adding, "[Pyle] wasn't listening when I said we couldn't have discussions until after
March 1, 2021 [due to the Munich make whole payment] … I'd like to keep the Swiss Re
door open and stay close to Katie."  Doc. 66-30 at 1.  Micucci agreed and asked:  "Do we
need [Pyle] to promote these discussions?  I agree, we should continue to engage with
Swiss, but are we tied to [Pyle] if we do?"  *Id.*  Importantly, neither Shevlin nor Micucci
discussed the issue with Pyle.  Doc. 66 at 11.

Pyle and McGrath continued to discuss the potential deal over the next few days.
For example, McGrath emailed Pyle on September 15, 2020, writing, in part:  "I wanted
to circle back on TMS.  I know you were looking for a list of data, but my notes indicate
that we agreed to get Mike [Shevlin] together with some of our senior team.  I would like
to start with Ken Gumbiner, our Head of Sales once we have an executed NDA.  Let me
know your thoughts."  Doc. 65-10 at 1.

That same day, Pyle responded to McGrath, stating:  "We're working on providing
you with some details regarding their portfolio … We can then initiate a call with Ken
Gumbiner and yourself to discuss, and possibly schedule a face-to-face meeting."  *Id.*;
Doc. 63 ¶ 35.

Some discussions followed as to Cypress Creek's role in the transaction.  As
McGrath put it in a private email dated September 29, 2020 to her colleague, Thomas
Gibbons:

> Can you look at #10 on this NDA.  I think I misread it.  I thought
> they were saying they represented [TMS] but they are telling me I
> agreed they represent us?  Since there is no fee or engagement letter,
> I am trying to understand how this guy gets paid.

Doc. 65-12 at 2.  Gibbons pointed out that Westport had previously signed an NDA for another deal like the one it signed for the potential TMS deal, and that paragraph 10 of the NDA in that deal read the same as paragraph 10 in this deal.  *Id.* at 1.  He also noted that Cypress Creek would need to negotiate its compensation.  *Id.* at 2.  Later that day, McGrath spoke with Pyle to clarify Cypress Creek's role in the agreement and that same day she memorialized the parties' conversation in an email to Pyle.  In that email, McGrath noted that Westport's understanding was that Cypress Creek had been "engaged by TMS for strategic discussions that could potentially lead to a sale post July 2021." Doc. 65-13 at 2.  She added that "we should make the same change to item #10 showing you as representative for [TMS]."  *Id.*

Pyle circulated a revised NDA on September 30, 2020 and, in his cover email, explained that Cypress Creek did not need to be recognized as a "representative" of Swiss Re or TMS—but it did need to be recognized as the "facilitating party."  Doc. 63 ¶ 42.  In other words, Pyle's understanding of the potential deal was that Cypress Creek would be acting as an intermediary between TMS and the potential buyer.  Doc. 65-31 at 17.   Pyle advised that he removed all references to "acquisition" in the NDA due to Shevlin's concerns about the Munich make whole payment provision.  Doc. 66-14 at 1.  Lastly, Pyle proposed a structure for how Cypress Creek would be compensated, noting specifically that:

> While this might be a bit premature, we want to be clear with/in our expectations. In the spirit of full disclosure (and as there is no reinsurance to be placed), [Cypress Creek] would anticipate compensation if any partnership took effect.  **We'd anticipate a 1%-2% facilitation fee on all gross premium** which would flow through the Swiss Re issuing carrier platform by TMS Re.  This would be paid by Swiss Re to [Cypress Creek] if any such partnership was solidified.

Doc. 63 ¶ 43 (emphasis added).

One day later, on October 1, 2020, Shevlin sent an email to Cypress Creek, copying McGrath and Micucci for "transparency purposes," stating that TMS was not

looking to be acquired or to have any discussions regarding acquisition.  Doc. 66-15 at 1–2.  Shevlin also asserted that TMS had not engaged Cypress Creek in any capacity.  Doc. 66-15 at 1.  Shevlin further noted that "[i]f we decide to execute an NDA with Swiss Re Corporate Solutions for a potential [employer stop loss] partnership, we will develop the proposed wording, and send directly to Swiss."  *Id.*  Critically, the email stated that such an NDA "will not include recognition of [Cypress Creek] in any capacity.  You will need a separate agreement between [Cypress Creek] and Swiss Re that clearly articulates your role with Swiss Re, and any potential for compensation."  Doc. 66-15 at 1–2.  To further clarify TMS's position, Shevlin stated "[o]bviously, we will not sign the inappropriate NDA you have presented to us."  *Id.* at 2.

On October 2, 2020, McGrath privately emailed Shevlin, advising that:  "I had received an email from him in advance of yours advising he expects Swiss Re to pay 1-2% of premium to him.  I haven't yet responded but will copy you."  Doc. 66-15 at 1.

Pyle sent Shevlin and McGrath an email on October 2, 2022 raising the following four points:

1) Cypress Creek Intermediaries, Inc. brought Swiss Re to your attention with regards to a current partnership opportunity overseen by Katie McGrath, new Head of A&H Swiss Re.  No other party did.  While you might maintain a Swiss Re relationship, you had never previously conversed and/or connected with Katie to discussions of any such TMS partnership with Swiss Re.

2) You personally instructed us to initiate a call with Katie McGrath of Swiss Re via telephone discussion on August 31, 2020.

3) On August 31, 2020 you subsequently confirmed our assistance in initiating the call with Swiss Re and Katie McGrath.  Below is your written correspondence indicating such.  This email clearly indicates intent to work through our firm to initiate these discussion(s).

[4] After the call we were requested to execute a Non Disclosure Agreement, which we did and Swiss Re subsequently signed.  This verbiage recognizes (from Swiss Re's side) our firm in any such negotiations.  Please note this Non Disclosure Agreement

> is the exact same verbiage you'd approved previously via our
> workings with another party.  This is enclosed as well.

Doc. 66-16 at 1–2.  When Shevlin was shown this email at his deposition, he conceded

that he had no basis to dispute or refute these points.  Doc. 66-41 at 79–80.  McGrath

likewise conceded that she had never met Shevlin prior to Cypress Creek introducing

them.  Doc. 66-40 at 69.

Shortly thereafter, also on October 2, McGrath rejected Pyle's fee proposal via

email, stating that her company had not engaged Cypress Creek.  She specifically claimed

that:

> Swiss Re has a very specific engagement process and obviously did
> not engage Cypress for services since there would be a contract to
> that end.  Swiss Re will acknowledge specific relationships, as we
> thought was the case between TMS and Cypress.  However, since
> TMS also did not engage Cypress to seek out partnerships, I am not
> certain where we go.

Doc. 65-15 at 1.  Following this email, Westport and Cypress Creek did not engage in any

more discussions despite Pyle's attempts to contact McGrath.  Doc. 63 ¶ 46.

*Swiss Re Acquires TMS*

Approximately four months later, in February 2021, Westport once again initiated

contact with TMS to discuss a potential deal.  Specifically, McGrath emailed the Swiss

Re team to share that she spoke with TMS, who shared that TMS had a non-compete with

Munich, its previous owner, but it was willing to discuss a potential deal after March 1

and suggested convening "a small group … just to determine if there is any opportunity

for us."  Doc. 63 ¶ 49; Doc. 65-16 at 2–3.  In that same email thread, McGrath added,

"[a] reinsurance broker[6] mentioned to them we were growing and connected us last year.

It was premature due to the non compete, and we agreed to reconnect early this year."

Doc. 65-16 at 2.

---

[6] The reinsurance broker is presumably Cypress Creek.

Cypress Creek did not participate in the acquisition once contact was re-initiated in February 2021.  Doc. 63 ¶¶ 46, 50.

McGrath emailed Gibbons on April 21, 2021, telling him that she "wanted Steve [Swiss Re's In House Counsel] to look at the NDA with Cypress Creek.  I know it wasn't signed but don't want this guy [Pyle] to cause a stink."  Doc. 66-19 at 1.  On July 1, 2021, Westport and TMS executed a letter of intent agreeing that Westport would purchase TMS for $19.6 million.  Doc. 66 at 14.

On October 25, 2021, Shevlin forwarded McGrath the October 2, 2020 email in which McGrath advised that Pyle had sent her an email saying expects Swiss Re to pay 1-2% of premium to him, adding:  "We should probably address any potential situation regarding [Pyle]."  Doc. 66-21 at 1.  McGrath responded that she "recirculate[d] this with our attorney and they are aware.  We can chat on our next call but not sure what else to do beyond that."  *Id.*

As negotiations continued, the issue of Cypress Creek's compensation remained on Swiss Re's "open issues" list long after communications with Pyle ceased.  Doc. 66 at 16; *see also* Doc. 66-23 at 5.  Westport's and TMS's attorneys drafted a "side letter" on December 14, 2021 in which Westport agreed to "defend, indemnify and hold harmless TMS, TMS Re, LLC, Michael Shevlin and Travis Micucci … from and against any actions, causes of action, judgments, awards, liabilities … arising from any claim or action brought or made by Cypress … for any compensation or remuneration arising out of or in connection with the Transaction."  Doc. 66-24 at 2.  TMS's counsel "believe[d] it was necessary to reflect the agreement of the parties, protect the Seller and [Shevlin] and [Micucci] and that it does not affect either parties' liability or position as to any claim or in any suit."  Doc. 66-24 at 1.

Swiss Re ultimately acquired TMS in December 2021 for approximately $14.5 million at the closing, plus potential "earnout" payments of up to $4.9 million.  Doc. 64 at 10; Doc. 63 ¶¶ 50–51.  The acquisition is documented by a Stock Purchase Agreement

dated December 17, 2021 between a Swiss Re company, SR Corporate Solutions America Holding Corporation ("SR"), and TMS's parent, TMS Re LLC.  Doc. 63 ¶¶ 50–51.  The Stock Purchase Agreement did not include any reference to Cypress Creek.  *See generally* Doc. 66-25.

### B.  Procedural History

Cypress Creek filed a complaint against Westport on May 5, 2022 alleging several causes of action:  breach of contract, unjust enrichment, quantum meruit, breach of the covenant of good faith and fair dealing, fraud, and a violation of a Massachusetts law for unfair and deceptive practices, Massachusetts General Laws Chapter 93A.  Doc. 1.  On August 9, 2022, Westport moved to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Doc. 20.

The Court granted in part and denied in part the motion to dismiss on February 6, 2023.  Doc. 26.  Specifically, the Court dismissed Cypress Creek's claims for breach of contract, breach of covenant of good faith and fair dealing, fraud, and unfair and deceptive acts and practices under Massachusetts law.  *Id.*  The Court also concluded, however, that Cypress Creek had stated a claim for unjust enrichment and *quantum meruit*.  *Id.*

Westport filed the instant motion on December 4, 2023, seeking summary judgment on Cypress Creek's unjust enrichment and *quantum meruit* claims on the basis that Cypress Creek cannot meet its burden of proof on three essential elements of its quasi-contract claims.  Doc. 64 at 5.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed.R.Civ.P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free School District*, 812 F.Supp.2d 454, 467 (S.D.N.Y.2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir.

2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law."  *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998).  Conversely, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322–23).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

### III.    DISCUSSION

Under New York law, "quantum meruit and unjust enrichment claims are analyzed together as a single quasi-contract claim." *National Utility Service, Inc. v. Tiffany & Co.*, No 07-cv-3345 (RJS), 2009 WL 755292, at *9 (S.D.N.Y. Mar. 20, 2009) (citing *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)); *see also Snyder v. Bronfman*, 921 N.E.2d 567, 569 (N.Y. 2009) ("Unjust enrichment and quantum meruit are, in this context, essentially identical claims, and both are claims under a contract implied … in law to pay reasonable compensation." (alteration in original) (internal quotation marks omitted)).

To recover in *quantum meruit* under New York law, "a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Mid-Hudson Catskill*, 418 F.3d at 175 (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000)).  Similarly, to state a claim for unjust enrichment under New York law, a plaintiff must plead facts showing that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (citations and internal quotation marks omitted).  Under either theory, the "essence" of the claim "is that one party has received money or a benefit at the expense of another." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citation omitted).

#### A.  Genuine Issues of Material Fact Exist as to Whether the Writings Satisfy the Statute of Frauds

Westport argues that Cypress Creek cannot recover in quasi-contract because it has failed to satisfy the New York Statute of Frauds, N.Y. Gen. Oblig. Law § 5-701, and that this warrants a finding of summary judgment in their favor.  Doc. 64 at 12–19. Cypress Creek counters that the Statute of Frauds does not apply because there is no

evidence that Cypress Creek's claim is fraudulent and that Westport is attempting to use the Statute of Frauds "to evade just obligations." Doc. 66 at 17.

> The New York Statute of Frauds provides as follows:

>> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:  is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity… "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction.

N.Y. Gen. Oblig. Law § 5-701(a)(10) (McKinney).

As this Court previously noted, the Statute of Frauds "adds an additional layer to the allegations and proof a plaintiff must offer to pursue a claim for unjust enrichment and in *quantum meruit*." Doc. 26 at 16 (Opinion & Order on the Motion to Dismiss). New York's Statute of Frauds mandates that the terms of any agreement must be in writing, or else it is void. *See* N.Y. Gen. Oblig. L. § 5-701(a)(10). Under the statute, this requirement applies equally "to a contract implied in fact or in law to pay reasonable compensation." *Id.* Therefore, this bar applies to claims brought under theories of unjust enrichment, as well. *See Tower Intern., Inc. v. Caledonian Airways, Ltd.*, 969 F. Supp. 135, 139 (E.D.N.Y. 1997), *aff'd*, 133 F.3d 908 (2d Cir. 1998) (citing *Bradkin v. Leverton*, 257 N.E.2d 643, 646 (N.Y. 1970)).

As Westport correctly points out, "[t]o be considered a sufficient memorandum within the ambit of the Statute of Frauds, a writing must designate the parties, identify and describe the subject matter and state all the essential or material terms of the contract." *JGV Apparel Group, LLC v. Abu*, No. 22-cv-9210 (GHW) (JLC), 2024 WL 2093046, at *4 (S.D.N.Y. May 8, 2024) (quoting *DeRosis v. Kaufman*, 641 N.Y.S.2d 831, 832–33 (1st Dep't 1996)). "[A]n agreement may be pieced together from separate writings," if the writings are "connected with one another either expressly or by the

internal evidence of subject matter and occasion." *DeRosis*, 641 N.Y.S.2d at 833 (quotations omitted).

In a quasi-contract action, "a sufficient memorandum need only evidence the fact of plaintiff's employment by defendant to render the alleged service." *Morris Cohon & Co. v. Russell*, 23 N.Y.2d 569, 575–76 (1969). Courts have determined that defendants cannot hide behind the Statute of Frauds where writings evidence the "engagement of the plaintiff's services in connection with a transaction that was later brought to fruition." *Case Property Services, LLC v. Columbia Properties Phoenix, L.P.*, No. 17-cv-3110 (NSR), 2023 WL 2664262, at *13 (S.D.N.Y. Mar. 27, 2023) (citing *Springwell Corp. v. Falcon Drilling Co.*, 16 F. Supp. 2d 300, 314 (S.D.N.Y. 1998) (refusing to dismiss plaintiff's *quantum meruit* claim where defendant's letter acknowledged plaintiff "was in fact of service" to defendant "in dealing with" third party)); *see also Shapiro v. Dictaphone Corp.*, 411 N.Y.S.2d 669 (2nd Dep't 1978) (to sustain a quantum meruit claim, "[t]he writings need not evidence an actual intention to pay. It is sufficient if the evidence demonstrates that services were requested and the parties reasonably expected that such services were not to be performed gratuitously."). Here, the record includes several emails and documents that could serve to establish the "fact of plaintiff's employment by defendant to render the alleged services." *Case Property Services*, 2023 WL 2664262, at *12 (quoting *Morris Cohon*, 23 N.Y.2d at 575–76).

*First*, in the email dated June 29, 2020, McGrath told Pyle that "[w]e would have an interest" in the acquisition Cypress Creek brought to Westport's attention, acknowledging an interest in Cypress Creek's services. Doc. 66-3 at 1. Pyle's initial email to McGrath says, "[t]he staff of Cypress Creek Intermediaries looks forward to working with you on a greater basis in 2020" before diving into details about the acquisition of TMS he was pitching. *Id. Second*, in the email chain dated August 28 to 31, 2020, Westport agreed to participate in a three-way call with TMS and Cypress Creek that Cypress Creek facilitated. Doc. 66-4 at 1–2. In fact, Shevlin "personally instructed"

Cypress Creek to set up the call.  Doc. 66-16 at 1.  *Third*, the email dated September 1, 2020 that followed the three-way call that took place earlier that same day shows that Pyle prepared an NDA in accordance with what was discussed during the call.[7]  Doc. 66-5 at 1.  The NDA identified Cypress Creek as Westport's "representative."  Doc. 66-10.  *Fourth*, Westport signed the NDA just 10 days following the call.  *Id.  Fifth*, at the request of McGrath and Gibbons, Cypress Creek prepared a revised draft of the NDA, switching the word "representative" to "facilitating party."  Doc. 66-14.  In his email response, Pyle stated that, "[w]hile [Cypress Creek does not] need to be recognized as an actual 'representative' of either Swiss Re or TMS Re, we do need to be recognized as the facilitating party."  *Id.  Sixth*, Pyle removed all references to "acquisition" in the NDA due to Shevlin's concerns about the Munich make whole payment provision.  Doc. 66-14 at 1.  *Seventh*, four days after having executed the NDA and providing same to Pyle, McGrath sent an email to Pyle stating:  "I wanted to circle back on TMS.  I know you were looking for a list of data, but my notes indicate that we agreed to get [Shevlin] together with some of our senior team."  Doc. 66-11.  These documents, taken together, could suffice to show that Westport acknowledged and accepted Cypress Creek's services in connection with the TMS acquisition.

Additionally, Cypress Creek's actions, including facilitating and participating in the introductory three-way telephone call that took place on September 1, 2020, were in service of facilitating the acquisition.  *See, e.g.*, *Orderline Wholesale Distributors, Inc. v. Gibbons, Green van Amerongen, Ltd.*, 675 F.Supp. 122, 128 (S.D.N.Y. 1987) ("[T]he New York Court of Appeals held that 'negotiating a business opportunity' within the meaning of [the New York Statute of Frauds] includes the use of 'connections,' 'ability,' and 'knowledge' to facilitate or assist in the transaction by helping the acquirer of the

---

[7] Shevlin, in his deposition conceded that he had no basis to dispute or refute that Cypress Creek introduced TMS to Swiss Re/Westport at his request, that TMS "inten[ded] to work through [Cypress Creek]" to discuss a potential acquisition.  Doc. 66-41 at 79–80.  McGrath likewise conceded that she had never met Shevlin prior to Cypress Creek introducing them.  Doc. 66-40 at 69.

business opportunity meet the right people and have the right information."). Here, Cypress Creek used its connection with TMS to pitch the acquisition to Westport, and the parties thereafter met to discuss a transaction that was ultimately consummated. The parties' course of conduct in connection with the call and thereafter, including discussions about how Cypress Creek would be compensated, at the very least, raises sufficient issues of material fact to warrant denying the motion for summary judgment.

Westport argues that "McGrath's response [in the email chain dated August 28-31], in which she simply proposed a time for an introductory call, cannot possibly establish that she believed that she was employing [Cypress Creek]." Doc. 64 at 16. However, it is not necessary that a single email or document by itself satisfy the Statute of Frauds; the Statute of Frauds can be satisfied on a quasi-contract claim by a series of emails or writings. *JGV Apparel Group*, 2024 WL 2093046, at *4 (quoting *DeRosis*, 641 N.Y.S.2d at 833) ("[A]n agreement may be pieced together from separate writings," provided that the writings are "connected with one another either expressly or by the internal evidence of subject matter and occasion.")

Westport further argues that the revised version of the NDA which replaced "representative" with "facilitating party" and "was plainly meant to supersede the original, negates any suggestion that Westport had somehow agreed to employ [Cypress Creek." Doc. 64 at 17. The Court finds neither "representative" nor "facilitating party" indisputably "establish that [Cypress Creek's] role was minimal," as Westport argues. *See In re J.P. Jeanneret Associates, Inc.*, 769 F. Supp. 2d 340, 371 (S.D.N.Y. 2011) ("A broker or finder or facilitator is a classic example of an outsider who plays a behind-the-scenes role in a business transaction."). The Court further finds that "[a]t a bare minimum, the revised NDA does nothing other than raise another genuine issue of material fact precluding summary judgment." Doc. 66 at 22.

Westport then tries to argue that the whole time McGrath was talking to Pyle, "Westport thought it was dealing with its *counterparty's representative*" because "[i]n the

context of [] Pyle's emails," paragraph 10 of the NDA "can only mean that [Cypress Creek] was TMS's representative.  Doc. 68 at 7.  However, this argument is not convincing given that Westport had previously signed an NDA for another deal that was identical to the one it signed for the potential TMS deal, and that NDA recognized Cypress Creek as Westport's representative.  *See* Doc. 66 at 9.

Lastly, Westport argues that discovery undermined Cypress Creek's case because the "context of prior … deals between Pyle and McGrath proved to be misleading at best" since "there was *no* context of prior merger and acquisition deals between" Pyle and McGrath.  Doc. 64 at 15 (internal quotations omitted) (emphasis in original).   Pyle, in his deposition, stated that his only prior deal with McGrath was placing a reinsurance contract for her former employer for three years, from 2005 to 2007.  Doc. 63 at ¶¶ 9–11.  As Cypress Creek argues, however, even if McGrath had never engaged Pyle's services in the context of acquisitions, she nonetheless engaged him for his services in other business deals and paid him for those services.  Doc. 66 at 23.  That McGrath had never employed Pyle's services for this exact type of acquisition does nothing to counter the fact that "McGrath was well aware that Pyle's work within the industry was for profit." *Id.*

For all the reasons set forth above, Westport has failed to successfully allege that there are no genuine issues of material fact as to the existence of a writing sufficient to satisfy the Statute of Frauds.  Accordingly, Westport's motion for summary judgment is denied.

### B.  Genuine Issues of Material Fact Exist as to Whether Westport and Cypress Creek Had a Reasonable Expectation That Westport Would Owe Cypress Creek a Finder's Fee

Westport argues that summary judgment is independently warranted because Cypress Creek cannot prove that the two parties reasonably expected that Westport would owe Cypress Creek a fee for the introduction during the September 1, 2020 call.  Doc. 64

16

at 19.  Specifically, Westport argues that "an expectation of compensation must be communicated."  *Id.* at 20.

Courts have established that "the fourth element of a quantum meruit claim requires that the circumstances must have reasonably notified the defendant that the plaintiff was expecting to be paid…"  *In re Chateaugay Corp.*, 139 B.R. 598, 606 (Bankr. S.D.N.Y. 1992).

Here, Westport argues that Cypress Creek did not request the compensation until *after* it introduced Westport to TMS.  Doc. 64 at 21.  Specifically, Westport points to Pyle's email dated September 30, 2020 in which he says that he was "prematurely" raising the subject of compensation:

> While this might be a bit premature, we want to be clear with/in our expectations.  In the spirit of full disclosure (and as there is no reinsurance to be placed), [Cypress Creek] would anticipate compensation if any partnership took effect.  We'd anticipate a 1%-2% facilitation fee on all gross premium which would flow through the Swiss Re issuing carrier platform by TMS Re.  This would be paid by Swiss Re to [Cypress Creek] if any such partnership was solidified.

Doc. 63 ¶ 43.  This email came almost one month after the introductory call, which Westport argues proves that at the time of the call, "neither [Cypress Creek] nor Westport could have had a reasonable expectation that Westport would owe [Cypress Creek] anything."  Doc. 64 at 21.  Cypress Creek argues that "Westport's mischaracterization of what [Cypress Creek] was doing is incorrectly narrowed merely to the introductory phone call," Doc. 66 at 24, and that, in any case, Pyle testified that he had first "broached" the topic of compensation with McGrath at around the time of the three-way introductory call that took place on September 1, 2020.  Doc. 66-39 at 58–59.  Specifically, Pyle testified that he advised McGrath that Cypress Creek would be paid a brokerage fee if reinsurance was placed, but that, otherwise, "a fee would be paid."  *Id.* at 59.  McGrath's response was, "we're not there yet."  Doc. 65-31 at 14.

Contrary to Westport's purported understanding—that McGrath's statement is an indication that neither party had a reasonable expectation that Westport would owe Cypress Creek a finder's fee—the Court finds that this statement suggests exactly the opposite: that McGrath knew compensation would be part of the discussion at some point, but that she was not ready to discuss specifics yet. Indeed, Cypress Creek notes that McGrath privately emailed Gibbons on September 29, 2020 saying, "I am trying to understand how [Pyle] gets paid."[8] Doc. 65-12 at 2. In response, Gibbons pointed out that Cypress Creek would need to negotiate its compensation. *Id.* at 2.

Additionally, the fact that the issue of Cypress Creek's compensation remained on Swiss Re's "open issues" list long after communications with Pyle ceased also suggests that Swiss Re deemed the topic of compensation it owed Cypress Creek unresolved. Doc. 66 at 16; *see also* Doc. 66-23 at 5. Likewise, the fact that TMS's attorneys drafted a side letter with Westport to "defend, indemnify and hold harmless TMS, TMS Re, LLC, Michael Shevlin and Travis Micucci" from any actions brought by Cypress Creek is "strong evidence that Westport and TMS both privately expected that there was a genuine issue as to compensation to [Cypress Creek]." Doc. 66-24 at 2; Doc. 66 at 16.

Westport also argues that in other acquisitions, the seller, rather than the buyer, paid Cypress Creek's fee. Doc. 64 at 22. Accordingly, Westport argues, Cypress Creek could not have reasonably expected to be paid by Westport, TMS's buyer. *Id.* However, Pyle, in his deposition, noted that each deal varies in who pays Cypress Creek's fee depending on the merits of each deal. Doc. 65-31 at 6.

Lastly, Westport argues that because Pyle testified that he had been engaged by both TMS and Swiss Re, Doc. 65-31 at 17, Cypress Creek could not have reasonable expectations as to which of the two of them would pay Cypress Creek's fee. Doc 64 at

---

[8] Cypress Creek highlights that McGrath did not advise Pyle that Westport would not pay Cypress Creek until after Shevlin sent Pyle his "disavowal" email. Doc. 66 at 22. McGrath privately emailed Shevlin saying, "I received an email from him in advance of yours advising he expects Swiss Re to pay 1-2% of premium to him. I haven't yet responded but will copy you." Doc. 66-15 at 1.

22–23.  Westport adds that Cypress Creek's expert, Steven Schouweiler, had no opinion as to whether the buyer or the seller had to pay the finder's fee and that he would have to look back at the documents to give an answer.  Doc. 64 at 23.  In response, Cypress Creek contends that Westport mischaracterized Pyle's testimony because Pyle also testified "he did not agree with the term 'engaged' but clarified as to an understanding by both parties that [Cypress Creek] was acting as an intermediary."  Doc. 66 at 27–28.  The Court finds that this uncertainty as to who would pay Cypress Creek the fee is a genuine issues of material fact and is therefore another reason to deny summary judgment.

### C.  Genuine Issues of Material Fact Exist as to the Reasonable Value of Cypress's Services

Finally, summary judgment is also not warranted because genuine issues of material fact remain as to the reasonable value of Cypress Creek's services.

"In general, reasonable value is based on an hourly rate…"  *United Mobile Technologies, LLC v. Pegaso PCS, S.A. De C.V.*, 509 F. Appx. 48, 51 (2d Cir. 2013).  It is, however, "well-recognized exceptions based on clear and accepted market place conventions."  *Carlino v. Kaplan*, 139 F. Supp.2d 563, 565 (S.D.N.Y. 2001).

Here, Westport argues that summary judgment is warranted because Cypress Creek has failed to prove the reasonable value of its alleged services.  Doc. 64 at 23.  Westport further contends that Cypress Creek's "damages 'number' is not only utterly unsupported, but also grossly inflated."  Doc. 64 at 26.  Cypress Creek responds that the 1-2% of the premiums that flow through Westport from this acquisition for a three-year period was the exact amount Pyle shared with McGrath via email on September 29, 2020.[9]  Doc. 66 at 29.

---

[9] Specifically, in its response to Westport's Local Rule 33.3 damages interrogatory on March 22, 2024, Cypress Creek stated the following:  "Cypress Creek seeks damages for its unjust enrichment and quantum meruit claims in the amount of 2% of the annual gross earned premium within TMS Re that flowed through Westport from the accident and health stop loss business acquired when it purchased TMS Re for the three (3) underwriting years following the acquisition of TMS Re by Westport, specifically for 2022-2024."  Doc. 65-30 at 2.

Westport argues that Cypress Creek had been avoiding its burden of addressing its alleged damages until this point, and that even then, Cypress Creek did not reduce this theory of damages to a dollar amount.  Doc. 64 at 24–25.  Cypress Creek responds that it was unable to give an exact dollar amount "given that the three-year period in question was not yet complete at the time the complaint was filed and [Cypress Creek] was not privy to Westport's premium data."  Doc. 66 at 29.

Lastly, Westport argues that there is no marketplace convention "under which a broker that introduced the parties to an acquisition would be compensated based on a percentage of premium."  Doc. 64 at 26.  Instead, as Pyle testified, compensation in such cases is based on a percentage of the purchase price.  Doc. 65-32 at 5.

Given the above, the Court find that there is a triable issue of fact as to whether the 1-2% scale that Cypress Creek communicated to Westport is reasonable in these types of transactions.  *McElroy v. Klein*, No. 05-cv-5437 (JSR) (JCF), 2007 WL 1821699, at *12 (S.D.N.Y. June 26, 2007), *report and recommendation adopted*, No. 05-cv-5437 (JSR), 2007 WL 2388350 (S.D.N.Y. Aug. 21, 2007) ("The value of the services is an issue of fact and must be determined at trial.  Accordingly, I recommend that the defendants' motion for summary judgment on the plaintiff's quantum meruit claim be denied.").

## IV.    CONCLUSION

For the reasons set forth above, Westport's motion for summary judgment is DENIED.  The parties are directed to appear for a conference on October 15, 2025 at 11 a.m., in Courtroom 619 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 62 and 69.

It is SO ORDERED.

Dated:    September 18, 2025
          New York, New York

_____
          EDGARDO RAMOS, U.S.D.J.